The next case, number 24-1634, Robert P. Conlon et al. versus Francis Scaltreto et al. At this time, would counsel for the appellants please introduce himself on the record to begin? Good morning, Your Honor. If it may please the court, Patrick Driscoll on behalf of the appellant, the estate of Michael Conlon. With me today is co-counsel Jeanine Cotillo and Anthony Bonapane. Your Honor, I'm respectfully requesting two minutes for rebuttal. Yes, you may have two minutes. As the court is aware, we are here in regards to the senseless and avoidable killing of Michael Conlon on January 5, 2021 at the hands of the Newton Police Department. In the district court's decision allowing the defendant's motion to dismiss, the court correctly identified that there were two primary inquiries that are relevant to this court's de novo review. One is, is the force that was used against Michael Conlon reasonable? And secondly, would a reasonable officer in the appellee's position know that they were violating the Constitution when they used that force? In our view, the district court's decision is premised on a mischaracterization of the allegations in the First Amendment complaint. First, and as endorsed by the appellees in their papers, there is an allegation that somehow Mr. Conlon, at the time of the fatal shooting, was suspected of committing an armed robbery. If the court reads the First Amendment complaint at paragraph 50, it states that simply that the Newton Police responded to a, quote, purported armed robbery call. And that was the actual. But there's no specific allegation that they were aware it wasn't. So there are statements that they understood it was a mental health crisis happening. But are those mutually exclusive? So you could have an armed robbery and a mental health crisis. Your complaint really doesn't say one way or the other what was, what their knowledge was. And I apologize for interrupting. If you look at paragraphs 140 through 145, it states specifically that the appellees stated that he was not suspected of committing any crime. There isn't any allegations in the complaint that suggests that he committed any armed robbery or that he committed any armed robbery in regards to indulge. Rather than go through a paragraph-by-paragraph assertion, can I just focus more on the broader picture? Qualified immunity can be granted on a motion to dismiss, as happened here. If there is no plausible excessive use of force here, lethal use of force claims stated by the complaint, our review of that is a de novo review. So the real issue is sort of how, where to look at the allegations of the complaint. The district court says in its opinion over and over again, well, the complaint doesn't indicate X, Y, and Z. But you haven't had any discovery. And I don't know how the estate could possibly know the answers to X, Y, and Z, because that information is within the knowledge of the officers on the scene or the Newton Police Department. So putting that aside, I want to discount that, because I'm not certain it would be OK at summary judgment to consider that. But it's not necessarily OK on a motion to dismiss. So if we look at what you did plead, as I understand it, the police had a number of alternatives that they could have pursued short of using, of firing two lethal weapons at him and killing him. They knew he was a mentally ill young man. They may not have known the particulars, but they knew that. They knew that at the time he fled back to his apartment building, that the primary threat he posed was to himself. They knew that his mental health counselor was on the scene and available to talk with him, but made a decision not to have him talk with the counselor. They knew that he wanted to talk to his father. But instead of letting him talk to his father, they conditioned it on dropping a knife, which at that point was no danger to any officer. It was a danger to him. They knew they were not experts, because the Newton Police Department relies on this other, I take it it's a more statewide organization, which is available to talk to mentally ill people who are in these situations. And they called them, which was appropriate, and they knew they were on their way. Yet they decided that they had to accelerate things and not wait for this counselor to show up. If it was a counselor, I don't quite know. The officer trained to deal with this, who shows up six minutes later. They know that he's dropped the knife, and yet they attempt to shoot him with a beanbag gun. So all of this kind of suggests to me that there were a number of things that could have been done along the way to avoid getting into this situation. And it might, depending on how the facts develop in discovery, it might well turn out that these were not reasonable judgments by officers. This is not a split-second decision situation. There was a lot of time to work through this. So I'm beginning to think that you actually have a pretty good case only because of the plausibility standard. The evidence might show that every step the officers took was entirely reasonable. We don't know. We simply don't know. So do you want to add anything? Have I fairly summarized the case from your point of view? I think Your Honor has, but I would like to add two things that I think is relevant to the court's analysis. The first being is that the warning, that it's on par that we've specifically alleged that they used this deadly force without warning. That's McKinney. The district court's decision is silent. It says, actually, what Judge Saylor wrote is that it was unclear as to whether or not the complaint sufficiently alleged that a warning was provided. We allege that, in fact, not only was no warning provided, but to what Your Honor alluded to earlier, Mr. Conlon dropped the knife on the basis of two conditions by Appellee Scaltrato. One is that they would call his father, and the second was that he would not be physically harmed. That, in itself, I believe, gets us over the burden of a motion to dismiss. So can I ask, when you sort of get to that, the summary here is completely correct. And then so when you get sort of into the weeds here, you have sort of, I think of it really as two potential uses of force. One is the, I combine in my mind, the pointing and the misfiring of the beanbag gun, and then the lethal shooting. Do you analyze those differently? Do you see those, how do you, do you see that the first one was excessive, but the second one should be thought of differently, if you take the complaint to say, well, he did pick up the knife and started to go towards Officer Scaltrato? No. In this sense, Your Honor, and this is what I'm getting at, the totality of the circumstances of the review, which is the second element that, Your Honor, in regards to what I would add to supplement to what Your Honor recited as the allegations of the complaint, we specifically allege that prior to the use of the beanbag shotgun from a deadly distance of 12 feet, they were advised, the appellees by the state police, who are not parties to this case, that the tasers would be ineffective. So at the time that he dropped the knife on the condition that they would call his father and that he wouldn't be harmed, the officers, the appellees, endorsed and carried out a plan that they knew was going to result in the use of deadly force on a mentally ill, unarmed man standing in his home. And specifically, what I'm referring to is that even though we allege in the complaint that, in fact, there was a taser that was deployed, it actually was consistent with exactly what Troop Affinity told Appellee Chisholm and Appellee Mazzilli, that it was going to be completely ineffective due to the garb. So in regards to Your Honor, when I look at the framework, so getting to the core of what you're asking, they're not, you have to look at the plan. We look at, in stamps, we look at the reasonable actions of the officers. We can't just divide it on a moment-to-moment basis and set aside one fact here and another fact there. We have to look as to whether or not, at the time that the appellees all endorsed this plan, to use a beanbag shotgun. And in the event that that did not incapacitate him, because that's what they said at the inquest, which is the point of the beanbag was to incapacitate him, an unarmed, mentally ill male, that then they would have the lethal backup option would be Venice and Scaltretto. And so in my view, Your Honor, I don't see them as particularly divorced from one another because it was contemplated before the beanbag shotgun was even deployed that if it was successful or unsuccessful, whether it missed him, killed him, or caused some serious bodily injury, that it was always going to be the anticipation that if he went down the stairs to the Newton police officers or approached Officer Chisholm, that there was a substantial likelihood that he was going to be shot. And that's what the court said in stamps. I think stamps is a very important case. And I know Your Honor was the drafting, but it says that we don't immunize risky behavior in this commonwealth. No, no, no. Stamps doesn't help you that much. I wrote stamps. It was an entirely different situation. But there's no warning here before either the, I'll call it less lethal, the beanbag gun. And there was no warning before deploying that. And then there was no warning deploying the lethal weaponry, right? Correct. And is that? The hard part of this is you do the Fourth Amendment analysis, and then you have to get into, OK, was it clearly established? As you look to the clearly established part of this, which points, which mistakes do you think are the best to think about when it comes to that clearly established point? Do you think it's warning? Do you think it's something else? I think there's two. One is the warning is very clear cut. Because we allege it, it's there, and there's no allegations in the complaint. The second is the mental health. So if you look at the district court's decision, Gray v. Cummings held that an officer must take into account the mental health of the subject at the time of determining whether or not any force is reasonable. In the court's analysis, it seems as though the appellees are of the position that the court should read this in the light most favorable to the moving party. That the court should somehow conclude that because he was mentally ill, that he was a danger to everybody. When the facts of the alleges that he's in an empty residential building surrounded by police officers, as the court stated, he wasn't posing any risk. So it's never a question like, get away from the knife. That's your allegation. And just on that court's point, I apologize for going over, is that Stamps also makes a comment that the use of a taser on a mentally ill individual to quell them could be found to be a constitutional violation by a reasonable fact finder. And several courts have said, I don't know if we've said it, but I think several have said, using a taser, which is less than lethal force without a warning, is a violation. That would be a violation of the fact. And so I think that if the court is looking at, again, respectfully, Judge Lynch, I still lobby that Stamps does help us. But the other two are gravy comings of talking about the mental health of the subject, the use of a taser. You make an allegation that they also violated the Newton police standard protocol for handling this situation. In the Irish case and its progeny, although it's state-created danger, which applies to third parties, it also says whether or not there has been a violation of state police and local police protocols is, in fact, a factor. And the police now know it is a factor. And that's part of Stamps as well. So as I understood it, you were making one explicit and one less explicit claim of violation of procedure. One was the Newton police department's own, how you approach these situations. And the other was that it was established. You called this state agency to get their help. And yeah, they called them. But then they didn't wait, even though they knew they were on the way. And they escalated the situation in the interim. So can you just spend a couple of minutes on what you alleged as to those? Yes, as you saw in the complaint that we alleged specifically to the Newton police orders, the first one is that there are directives regarding the use of, quote, less than lethal shotgun. And it's only in circumstances where lesser means are not available to control the subject. That's not this case. I mean, he was complying. And he had already dropped a knife at the Newton police officer's request. And you are correct, Your Honor, in regards to the allegation where the mental health protocol was to contact NMLAC, which was a state agency that they sent out a counselor. They did that. And they simply, for reasons that we will never, I don't believe we can ever know without some discovery in the case, why the call was made. So they acknowledged that it was a mental health situation. But they never followed through. And they decided, unfortunately, for the Conlon family to take this incredibly risky path of action that left them. Can I just be clear factually what happened? Because I'm having a little trouble. He's on the third floor on a stairwell. Correct. The police are on the second floor landing. So just to be clear, if I may, I know I might have to move around a little bit. There's a stairwell. And he's on the platform. There is a door behind him. Newton police officers are behind that door. So it's shut. But there is a police presence behind the door. If you go down the stairs, there's Newton police officers that are saying that they had a barricade, like a riot shield. And they're behind there. Then the fatal shooter, the appellee Chisholm, he's at apartment number three. In that where they're saying he's standing, there is a photograph of a cigarette that he was smoking a cigarette at the time, Your Honor, when he was shot. That doorframe is less than 12 feet away. It's probably closer to, I've been there. It's about 11 feet. So it's fair to say, as I understand it, he's ringed around by police officers on the third floor in all of the apartments. So there is no way for him to get out through a back door.  Because the police came up a back door, right? They came a back way. They're in the apartments. They're on the second floor. And he's in the little hallway that's on the third floor. Correct. So there's nowhere for him to go. Exactly. And so there's only two doors on that floor. One has police officers behind it. The other one has police officers plus appellee Chisholm. How far away was he from the officers who shot him? If you are to believe that his back was up against that wall and that officer Chisholm, appellee Chisholm, came with a beanbag shotgun, I can represent to the court that it's certainly less than 10 feet away, the shotgun from when it was deployed. 12 feet is being generous. That's actually when we went out and measured it. It's as if you, as if appellee Chisholm stepped back. But it's certainly less than 12 feet. It's closer to 10 feet. I know from some other cases involving terrorists who were shot that there are certain protocols about people with knives and how many feet away they are from the officers. Are there, at which point, if they're too far away, they're not a lethal threat to the officers. If they are within a certain distance, it's considered that they can easily kill with a knife. Is there any allegation about that in this case? I have not specifically made an allegation in the complaint that says that he posed a threat if he was x feet away. My view of the case is that, again, Judge, he dropped the knife. And it's actually immaterial because if he's not armed with the knife at the time that they deployed the deadly force without warning. At the beanbag, but the district court relies on the fact that, according to the district court, he has picked up the knife again. Yes. OK. So he picks up the knife. He's 10 feet, maybe 12 feet away from the officers. And they consider that distance to be a lethal threat justifying shooting him. I would assume that's the case, although that's not. Obviously, that would be their position, that they would justify the shooting. Well, they haven't heard. There's no discovery. Correct. And so my only, I guess, my only direction of that to the court is, at the time, again, he was complying. He dropped the knife. We do cite, Judge, in paragraph 116, we talk about whether or not we were not primary counsel. There is, and counsel did raise it in their brief, that the original complaint stated that Mr. Conlin picked up the knife and made movements towards officers. We stated that that's what the appellees have, for the most part, alleged. However, we do note that in the inquest, we do allege in paragraph 116 why we believe that's potentially disputed at this point, because there's no photographic evidence. Right, and there's also some testimony from Captain Marzulli about not seeing the knife and not seeing the knife in that area. So before you sit down, can you just tell me, on the Monell claim, is your allegation that they had inadequate training or absolutely no training on how to use a beanbag gun and how to deal with mentally ill individuals? Right now, it's that it wasn't, because the one person that was supposedly trained on it couldn't fire it correctly. And so our Monell claim is saying that there was a need to be trained. The training was essentially non-existent. So although they might have had a protocol, but again, Your Honor, it's very- The only allegation that says they had absolutely no training is the on-the-ground failure to perform? Yes. How is there a policy not to train? I assume you've read Cosenza versus City of Worcester. Yes, I think, Judge, I think essentially the Monell is pretty- It's a weak claim. You said it, not me. We did plead indifference in our view. We felt that the need for training was obvious. However, I think, as you can see from the court, that our primary objective is addressing the 1983 individual claims. Because if we don't get over that hump, there is no Monell to even discuss about. Well, we have to deal with all of them, so. All right, thank you.  Thank you, counsel. At this time, would counsel for the appellees please introduce himself on the record to begin? May it please the court, I'm Tom Donahue. I represent the defendant's appellees in this matter. The district court properly dismissed this complaint because it contained no allegations for a plausible claim of excessive force. The complaint does not allege that Mr. Conlon was unarmed when he approached the officers. The complaint does not allege that- Well, focus on the beanbag. It does allege that that knife was on the ground. It alleges the knife was on the ground, but it alleges very clearly that he picked up the knife and approached the officers. After the police department, I believe it alleges, did not live up to its end of the deal. They shot, attempted to shoot a beanbag gun at him, and they did not tell him that they were, in fact, calling his father as he requested. So, Your Honor, there are no cases in this circuit or anywhere else to suggest to reasonable officers in this case that pointing the beanbag or attempting to fire it would violate the law. The law is not clearly established on that. And what the plaintiffs are really arguing is a problem- And, Your Honor, why was it reasonable to make the situation worse when they had alternatives for a mentally ill young man? They could have waited six more minutes. They could have called the father. They could have called the social worker. They could have given more warnings. There is law on each one of those points. So, there may not be a case on all fours, but it's a little hard to see why there's no plausible claim that this was objectively unreasonable. Your Honor, there is no plausible claim here because the complaint alleges that he picked up the knife and approached- Could you respond to the points I just made? What was the big rush here? The rush here, and, of course, as you cited, Your Honor, according to the complaint, the police could have done better. But that's not the qualified immunity analysis. Police can oftentimes do better. How about just focus on the pre-lethal shooting? He has dropped the knife at the urging of the officers on the premise, we will not harm you, and we will call your father. He does drop the knife. The next move is to bring out the beanbag gun that looks like a shotgun, point it at him. So, you're telling me, well, after that, he picked up this knife and charged us, that'd be whatever, put that aside. Why did they point a beanbag gun at him without even saying, sir, step away from the knife? Because he was surrounded. So, if he stepped away from the knife and they thought they needed to take him into custody, they were able to do that. Instead, with no warning, they pointed and fired this beanbag gun at him, which scared him. So, focusing on using that force with no warning, why was that not in violation of clearly established law? Because there's no case to tell officers that. And clearly... There are many cases that say you can't use less than lethal force on someone without warning them before doing it. Is the reason you didn't warn him is because he was mentally ill? Why? It was because it had been for 20 minutes. In a slow walk, that was the plan of your officers, slow walk it, you're succeeding, he drops the knife, the next step on promises you make, and the next step is let's employ the force without warning. Yes, they saw that as an opening to be able to subdue him to stop this that had been going on for 20 minutes and they were trying to get him help. So, clearly the plan didn't work. This is a tragic situation. But there are no cases... Also by the officers. I'm sorry, Your Honor. I'm back to the... They didn't warn him. They knew better, more expert help was on the way. Had they waited seven more minutes, this might not have happened. They chose to accelerate the pace of this and they chose a series of actions designed to scare him. All he hears is the click of a shotgun. He could well have thought, they're going to kill me. And then they do. And that, Your Honor, is the provocation theory that the plaintiffs are trying to bring that has been rejected by the Supreme Court. The Supreme Court says proximate cause is still okay. So even if you thought, even if you thought, and I'm not saying I think this, that the lethal shooting was okay, that definitely the proximate cause of that could be the unconstitutional excessive force of pointing and clicking a shotgun at this mentally ill person who's been promised, we're going to call your father and not hurt you. But in this case, the pointing of a weapon is not a constitutional violation and there are no cases the plaintiff hasn't cited to any cases, as is their burden, to show that the pointing of a weapon would violate the Constitution. Clearly, Stamps, Muldinski- They didn't just point the weapon, they shot it. He heard it. They attempted to shoot it and it didn't shoot. But the fourth question is whether he has been seized. You don't think pointing a beanbag gun at you and clicking at it from 10 feet away, you're not seized? He's clearly seized, but not in an unconstitutional sense of if we were to look at the facts of Muldinski and Stamps, neither of those cases would tell reasonable officers in these officers' shoes, in the context of this case, that what they did would violate the Constitution. Clearly, this is an ongoing case where he was there for 20 minutes they were trying to get him to drop the knife. When he finally does- I'm sorry. You keep saying, okay, it took 20 minutes and therefore they were justified in using lethal force. I think it tends to work the other way around, as Judge Afframe has said. Well, for 20 minutes, they seemed to be calming down the situation. And then they took steps which, in fact, accelerated any confrontation. So how does the 20 minutes help you? Well, it's- They're just impatient? They have another call they have to go to? No, certainly, Your Honor. That was their original plan, is we're going to try and wait this out. But he had had the knife, he had had a beanbag, he was banging on the knife on the door. Why do they call for the state police agency to come help if they're not willing to wait? Well, certainly, the plan changed when they saw an opening in this case, where they thought we have a chance to subdue him. It's a person that hasn't been listening to us for 20 minutes. So at that point, the first attempt to deploy the beanbag gun, if it had been successful, would you still be arguing the same case here? Well, had it been successful, Your Honor, it would be- In that it deployed? In that it deployed. If we imagine for a moment that it deployed and actually struck him and killed him, and killed him, in that case, it's still the same case. That's what I want to know, yeah. But if it didn't kill him, though, you still are using force against this person when you don't even say, step away from the knife, because you could have taken him, if he's away from the knife, the danger is gone. You have like five police officers. So the only danger I can conceive of is this knife, that you don't tell him to move away from, you just decide to employ the force. So if you employed that force without asking him to move away from the knife, whether you killed him or injured him, would that not be excessive force, clearly established, because you didn't even warn him? It's not. How do you align that with all the cases that say you cannot tase someone without giving them a warning? Well, I don't, those aren't, the cases I'm thinking of in this circuit. Well, we're not limited in doing this, only this circuit. There's a consensus, I think, that tasing someone without a warning is not acceptable. If that's right, is that the same thing? I'm not aware of specifically that, Your Honor, but it has to be in the specific context of each case. So what's the context here, that he's mentally ill and incapable of following instructions? Is that the context you want us to think about? Well, certainly the context of this case is he's suspected in the call is for an armed robbery. For 20 minutes, they're trying to get him to drop the knife. When he finally does, they see that as an opening, and that's why they point the weapon at him. Could I go back to Judge Howard's question? Suppose they had shot the beanbag gun and they had killed him. Again, no warning that they're about to use force that turns out to be lethal force. Deal with that hypothetical. There are no cases in this circuit or any other of which I'm aware that would put reasonable officers on notice that they may not use a beanbag less than lethal weapon in that situation. So even if that were... Well, their allegation is it's lethal. That is their allegation. I don't know how that's gonna play out, but right now, the beanbag gun as alleged is lethal force. That's certainly the label they put on it within the rules and regulations. It's a less than lethal. And there's some case law in the world that says from certain distances, these things are lethal. In some circumstances, it can be like a baton or any other police things. In certain circumstances, it can be lethal. We've talked about the law that before you use the taser on someone, I don't actually know the answer. Can tasers kill people? In some circumstances, those have been allegations. I don't know the science of that, but there are certainly lawsuits and allegations that say tasers have killed people. I'm not aware of any specific cases. I was just... You haven't argued that there is a factual distinction or a legal distinction between tasers and beanbags? Well, certainly for reasonable officers on the scene, when they're reading case law to figure out what's clearly established is there is a difference between tasers and the beanbag less than lethal weapons. So I don't think those taser cases would necessarily put reasonable officers on notice here that using the less than lethal would put them on notice that they're violating the Constitution. So there are different ways to incapacitate people and here the goal was to incapacitate, but that doesn't mean that the force that's used was commensurate with the circumstances and this is what I'm having, I'm having trouble getting my head around. It seemed like there were a lot of other alternatives. So what is it that allows them to conclude, not unreasonably, that the type of force that they attempted to deploy was appropriate? Well, it's alleged in the complaint that a taser wouldn't work in this situation because of the thickness of his clothing. Charging at Mr. Conlon certainly wouldn't work. There's a knife at his feet. So he still has easy access to weapons. I'm sorry, how close were the closest officers to him at that point? According to the complaint, 12 feet. He shot at point blank range. That is paragraph 14 of the complaint. So you're saying that the officer with the beanbag gun was the closest person to him? That's what's alleged in the complaint. Or near the officer, Scaltreda was the officer, speaking with him primarily. The allegation in the complaint is that he's 12 feet away and I believe the allegation in the complaint is the beanbag shotgun is pointed at Mr. Conlon from about that same distance of 12 feet. Officers who were behind the door, behind him, do you know, is it alleged? Did they have radio contact? I don't believe there's any allegations in the complaint about that. But the allegations- And the officer standing in the apartment door? I believe according to the complaint, there are different officers standing in different apartment doors. How close was the closest one according to the complaint? I'm not aware that that's in the complaint. I have not seen that, Your Honor. The one thing I'd like to point out to the court is obviously police officers oftentimes do not do the right thing. And that's the purpose of qualified immunity is to give them some breathing room for mistakes. There are no cases- Agreed, I very much agree with that. But the complaint was dismissed here. There was no discovery. We have only a partial sense of what happened. If it were on summary judgment, then it would be a different way of looking at the case. The question is whether it's plausible that they have a claim. May I respond, Your Honor? I'm out of time. Yes. It's not plausible that they have a claim. There was an inquest, so we have an incredibly detailed complaint. Based on the facts as alleged here, it is not plausible because of the defense of qualified immunity. And the one last thing I wanted to point out is, and I've said enough, that there are no cases to put reasonable officers on notice here that using the beanbag to subdue them in this situation would violate the Constitution. But what the district court also looked at is the allegation is that he picked up a knife and approached the officers. Those are the allegations. He was shot at point blank range according to the complaint. So that gives a sense of how close he was to the officers when they used deadly force. The cases such as Rahim, which officers is similar in some sense to this case, the man with the knife was shot at 25 feet away. No, no, no, no. Rahim was someone who was out to kill, likely behead someone as part of a terrorist operation and who said to his friends before he launched himself, I'm going to die today. The officers, he was clearly a threat to the public. He was out in public. He wasn't primarily a threat to himself. I don't see how this is anywhere close. And even there, they gave him many warnings to drop the weapon and subdue. That's to me the biggest distinction. And if I may respond to that, Your Honor, and I promise I'll sit down then. No, you won't. I have a question. Thank you, Your Honor. In this case, when a person is approaching police with a knife at point blank range, that certainly makes the use of deadly force reasonable in the context of this case. It does with a gun, whether it does with a knife at point blank from the officer's point of view, but whether from 12 feet away, a guy with a knife is a lethal threat to the officers is another matter. But according to the complaint, he approaches to the point of point blank with the knife. Yeah, I just responded to that. This is before the first attempted shot? This is the lethal shots. This is the second one. Okay, so going back to the first one, was it a ruse to tell him if you drop the knife, we'll get your father? Was that a ruse or did this decision to shoot him once he dropped the knife develop on the spot in the moment, or do you know? Is it alleged? What's alleged in the complaint is that once they finally got him to drop the knife, the officer that was communicating with him said there's an opening here. Okay, so why not shoot him before he drops the knife while he's still posing a threat? That's not alleged in the complaint, but I would think that it's dangerous shooting somebody that's holding a knife. But they wanted to get him away from knives to subdue him so it didn't injure him once they're using the bean bag. Thank you, counsel. All right, thank you, your honors.  Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has a two minute rebuttal. Patrick Driscoll on behalf of the appellant. Is there anything that the court desires me to address? The only thing I would ask the court is simply, we do cite to certain Newton police orders that talk about the specific circumstances that this less than lethal shotgun is to be used. I would ask the court to review that in the sense that it's only to be used when lesser force would be completely ineffective or inappropriate. I think we know from the complaint that there was many alternatives. And unless there's any further questions, I would rest on my papers. Thank you, counsel. Thank you. Thank you. Thank you, counsel. That concludes argument in this case. Counsel is excused.